Filed 9/6/19; Opinion following transfer from Supreme Court

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>NICHOLAS ANTHONY MUNOZ,<br><br>      Defendant and Appellant. | B283921<br><br>(Los Angeles County<br>Super. Ct. No. KA110065) |

      APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Judgment of conviction affirmed; sentence vacated and remanded for further proceedings.

      Law Offices of James Koester and James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

      Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant

---

[*]      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication.  The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

Attorney General, Yun K. Lee, Lindsay Boyd and David W. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

In June 2015, defendant Nicholas Anthony Munoz and his cousins, James Rojas and Jonathan Loaiza, all gang members, were driving in Pico Rivera. Munoz and Loaiza fired shots at another car, a Yukon sport utility vehicle, in which four people were riding. One shot injured, but did not kill, one of the passengers in the Yukon. When Munoz's group sped from the shooting scene, their vehicle tumbled down an embankment, killing Loaiza. Although the evidence showed both Munoz and Loaiza fired shots at the Yukon, it did not definitively establish which one of them fired the bullet that hit the victim. The jury was instructed that Munoz could be found guilty of the attempted murders of two of the Yukon's occupants if he was the perpetrator of the crime, was a direct aider and abettor, or if he committed the target offense of shooting at an occupied motor vehicle and murder was a natural and probable consequence of that offense. The jury found the allegation Munoz fired the shot that hit one of the victims not true, but convicted him of shooting at an occupied motor vehicle and two counts of attempted premeditated murder, with firearm and gang enhancements. The trial court sentenced Munoz to two consecutive life terms for the premeditated attempted murders, plus 50 years to life for the firearm enhancements.

In an unpublished opinion issued on October 11, 2018, we affirmed Munoz's convictions but vacated his sentence and remanded to allow the trial court to exercise its discretion to

strike or dismiss the firearm enhancements pursuant to Penal Code section 12022.53, subdivision (h).[1]  Our Supreme Court granted review and deferred further action pending disposition of *People v. Mateo* (rev. granted May 11, 2016, S232674).  *Mateo* presented the question of whether, to convict an aider and abettor of attempted willful, deliberate, and premeditated murder under the natural and probable consequences doctrine, a premeditated attempt to murder had to have been a natural and probable consequence of the target offense.

Meanwhile, the Legislature enacted and the Governor approved Senate Bill No. 1437 (2017—2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015), which amended the law governing application of the natural and probable consequences doctrine as it relates to murder.  The Supreme Court thereafter transferred this matter back to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill 1437.

In accordance with our Supreme Court's order, we vacate our October 11, 2018 nonpublished opinion.  After considering the parties' supplemental briefs, we conclude in the published portion of this opinion that Senate Bill 1437 does not apply retroactively to nonfinal judgments on appeal.  Moreover, Senate Bill 1437 does not apply to the offense of attempted murder.  In the nonpublished portion, we address Munoz's contentions of instructional error and evidentiary insufficiency, and remand for resentencing on the firearm enhancements.  Our analysis and disposition regarding these previously raised claims of error remain the same as in our original opinion.

---

[1]    All further undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

Munoz was a member of the Pico Viejo criminal street gang. His cousins, codefendant James Rojas, and Rojas's brother, Jonathan Loaiza, were also Pico Viejo members. Victor Espindola, David Carrillo, and Adrian Perez were all members of the Brown Authority criminal street gang. The Pico Viejo and Brown Authority gangs were bitter enemies. Their claimed territories overlapped, leading to ongoing violence and numerous shootings between the gangs. Both gangs claimed Streamland Park in Pico Rivera as their territory.

a. *People's evidence*

(i) *The shooting*

On June 26, 2015, between 7:00 and 8:00 p.m., Espindola, Carrillo, and Perez, along with a woman named Daisy, went to Streamland Park in Espindola's mother's burgundy Yukon SUV. At the park, Carrillo spoke to some men near the baseball diamond. Espindola's group then saw a person with whom they did not "get along." Carrillo or Perez confronted the man, who ran up a nearby hill.

Espindola then drove the group away from the park in the SUV. Carrillo and Perez sat in the back seat, with Carrillo on the driver's side. Daisy was in the front passenger seat. Espindola drove northbound onto Rosemead Boulevard, in the far right lane, at 10 to 15 miles per hour, looking for the man who had run up the hill. According to Espindola, his group did not intend to scare the man, but simply wished to determine why he ran from them.

Meanwhile, Rojas was driving his girlfriend's blue Mitsubishi Galant on Rosemead Boulevard, with passengers

4

Munoz and Loaiza. When Espindola's SUV was parallel with the park at the top of the hill, Rojas drove up to the SUV on the driver's side and Munoz and Loaiza fired shots directly at the SUV. Espindola heard six gunshots. He heard his window "pop" and a gunshot hit the car door, and then Rojas's Mitsubishi sped off. Espindola briefly continued driving on Rosemead until Carrillo said he had been hit, and lost consciousness. Espindola made a U-turn and drove Carrillo to the hospital. According to Espindola, he was surprised by the shooting and did not know why the assailants shot at his SUV. No one in Espindola's group was armed, and they did not display guns or shoot at anyone. The whole incident transpired very quickly.[2]

Carrillo was shot in the stomach and underwent surgery at the hospital.

(ii) *The accident*

Rojas drove from the shooting scene and attempted to enter the 60 Freeway at an excessive speed, causing the Mitsubishi to crash. Motorist Cynthia Arredondo observed the Mitsubishi tumble down an embankment by the Rosemead onramp, landing on its roof. Arredondo pulled over and called 911, while her boyfriend attempted to render aid. Munoz was partially pinned inside the car and was calling for help; he eventually managed to

---

[2] Espindola described the incident to detectives in a July 29, 2015 recorded interview that was played for the jury, and again in a second, unrecorded interview with a detective shortly before trial. At trial, Espindola denied being a gang member, denied making most of the statements in the interviews, professed not to remember most of the evening's events, and at times refused to answer questions. He did, however, confirm that no one in his group was armed or shot at Rojas's car.

5

free himself.  Loaiza, who had been seated in the front passenger seat, was deceased.  Rojas was outside the car, talking on a cellular telephone.  When Arredondo asked Rojas whether everyone was okay, he responded, " 'I killed my brother.' "  He also said someone had been chasing them.  Within three minutes, before emergency personnel or deputies arrived, a car picked Rojas up from the accident scene.

(iii)  *The investigation*

Two firearms were found outside the Mitsubishi at the accident scene:  a nine-millimeter Sig Sauer with an empty magazine, and a .380-caliber Lorcin semiautomatic pistol, loaded with a bullet in the chamber and a magazine containing five live cartridges.  At the shooting scene, which was approximately a half mile from the accident scene, deputies recovered a bullet fragment, four fired nine-millimeter cartridge cases, and one fired .380-caliber cartridge case.  Espindola's SUV bore five bullet holes, and five bullet fragments were recovered from the area between the vehicle's exterior and the interior panel.  Forensic examination revealed that the .380-caliber cartridge case had been fired from the .380-caliber Lorcin gun found at the accident scene.  Munoz's DNA matched DNA found on the .380-caliber Lorcin gun.  The four expended nine-millimeter cartridge cases and four of the bullet fragments had been fired from the Sig Sauer gun.[3]  Two of the bullet holes in the SUV were made by nine-millimeter bullets.  A Pittsburgh Pirates baseball cap that had been ejected from the Mitsubishi was on the ground at the accident scene.

---

[3]      The fifth bullet fragment was too small to allow for a conclusive comparison.

6

Rojas's Mitsubishi bore no evidence of bullet strikes, and no evidence suggested the occupants of the SUV shot at the Mitsubishi.

(iv) *Munoz's jail conversation with a confidential informant*

On June 29, 2015, Munoz was placed in a jail cell with a confidential informant. Their conversation was recorded and played for the jury. Munoz stated he was a Pico Viejo gang member with the moniker "Lil Scrappy." He described the incident as follows.[4] Some "fools," whom he believed to be Brown Authority gang members, had been chasing and attempting to shoot at or harm his cousin and fellow gang member, Loaiza. Loaiza was an "ace" and a "straight rider," that is, an active gang member known for committing crimes for the gang. Munoz and Loaiza shot at the Brown Authority gang members, with Munoz firing a .380 and Loaiza firing a nine-millimeter firearm. Munoz's gun jammed after he fired one shot. Loaiza, however "fucken served them, boom, boom, boom, boom, boom."[5] Although it was dark, Munoz "just knew it was them, though . . . I just knew it." When Munoz's group fled, the other car chased them. Munoz thought the Brown Authority gang members had guns and tried to pull them. When the accident occurred, he and Loaiza were not wearing seat belts. Munoz was injured, Loaiza died, and Rojas fled.

---

[4]    Munoz described the incident using street slang, which was in some instances interpreted by the gang expert.

[5]    According to the gang expert, "served," in this context, means shot at.

7

(v) *Gang expert's testimony*

Los Angeles County Sheriff's Detective Stephen Valenzuela testified as the prosecution's gang expert, regarding the Pico Viejo gang's membership, origins, territory, primary activities, symbols, "code of silence," and predicate offenses.[6] Pico Viejo was one of the most violent gangs in the Pico Rivera area. There had been numerous shootings between the Pico Viejo and Brown Authority gangs, and incidents of violence in Streamland Park. In Valenzuela's opinion, Munoz, Loaiza, and Rojas were Pico Viejo gang members.[7] The gang used the Pittsburgh Pirates "P" as one of its symbols, and the Pittsburgh Pirates baseball cap found at the accident scene was commonly worn by Pico Viejo gang members. Valenzuela opined that Espindola and Carrillo were members of the Brown Authority gang.

When given a hypothetical based on the evidence adduced at trial, Valenzuela opined that the shooting was committed for the benefit of, and in association with, the Pico Viejo gang. The shooting benefitted the gang by showing the community and other gangs that Pico Viejo gang members would "do anything to

---

[6]     Because Munoz does not challenge Detective Valenzuela's qualifications as an expert, or the sufficiency of the evidence to support the gang enhancement, we do not detail that evidence here.

[7]     Munoz had Pico Viejo-related tattoos, and had admitted his gang membership to the confidential informant, and to a detective; Valenzuela was also aware of Munoz's membership by virtue of his own investigation into violent crimes committed by the gang. Rojas and Loaiza also had Pico Viejo-related tattoos. Photographs showed Munoz, with Loaiza, Rojas, and others, making Pico Viejo gang signs.

8

protect their borders." Moreover, the gang members were acting together, looking for rivals. Such conduct would instill fear in the community and in gang rivals, thereby making them afraid to report crimes to police, "further[ing] the stranglehold that gangs and gang violence have in the community."

     b. *Defense evidence*

       (i) *Testimony from witnesses at Streamland Park*

Robert Mendoza and Savaltore Dominic Mendoza[8] were both at Streamland Park on the evening of June 26, 2015,[9] preparing the baseball fields for a tournament the next morning. Mariah Ginez and her boyfriend were also at the park at that time. Robert saw a male Hispanic walking around the park, apparently looking for something. Shortly thereafter, a maroon SUV pulled into the parking lot. Two Hispanic men exited the SUV and began "hanging out" with the first man at the baseball diamond's backstop. One of the men asked Robert whether there were any games that night, whether Robert knew a former Little League president, and whether anyone from Pico Viejo was at the park. Robert said only the Little League coaches were present. The men returned to the SUV. Shortly thereafter, one of the men returned to the field with a baseball bat and yelled, " 'Are you guys from Pico Viejo?' " Robert and Savaltore ignored them and moved to another area of the field. Savaltore phoned his wife and

---

[8]    For ease of reference, and with no disrespect, we hereinafter refer to Robert Mendoza and Savaltore Mendoza by their first names.

[9]    Although the witnesses did not testify to the precise date in June, there is no dispute that their testimony related to June 26, 2015, the date of the shooting.

asked her to call 911.  The SUV picked up the man with the bat, and "peeled out" of the parking lot.

Ginez observed a man at the top of a small hill on the back side of the park.  The driver of the SUV yelled at the man on the hill, "this is my barrio," or similar words.  The men seemed to be arguing, and the man from the SUV said, "let's go one-on-one."  However, the man from the SUV did not attempt to run up the hill after the other individual.

According to Robert and Savaltore, other than the baseball bat, the men from the SUV did not have any visible weapons, nor, according to Ginez, did the man who yelled at the person on the small hill.

Within five to 10 minutes, Robert, Savaltore, and Ginez heard gunshots nearby.

(ii)  *Rojas's testimony*

Rojas testified in his own defense.  His family had longstanding ties to the Pico Viejo gang.  In June 2015 he and his family were living in Bell Gardens.  On the night of the shooting, Loaiza called Rojas and said he was at Streamland Park to meet a girl, but did not feel safe and thought it might be a set up.  Rojas drove to the park and located Loaiza, who was with Munoz.  Rojas picked both men up and began driving home.  When he made a right turn onto Rosemead, he saw a burgundy SUV on the shoulder.  Loaiza said, " 'Those are those fools right there.' "  As Rojas neared the SUV, he saw the SUV's windows rolling down.  Rojas "hit the gas."  Almost immediately, Rojas heard gunshots and ducked.  He could not tell whether the shots came from inside or outside of his vehicle.  He continued down Rosemead Boulevard and saw, in his rearview mirror, that the other car was behind him, driving fast.  Rojas sped up and lost

10

control of his car, which plunged down an embankment, flipping several times. He had not been looking for anyone when he pulled onto Rosemead Boulevard; he had been planning to drive home. When Arredondo approached to help, he told her to leave because "we just got chased." He fled the scene because he was scared. He had gone to the park to protect his little brother; he had not come prepared for violence; he had not known, and had no reason to believe, that Loaiza had a weapon or that there were guns in the car. He denied being an active gang member, but admitted a prior association with the Pico Viejo gang.

2. *Procedure*

The jury found Munoz guilty of the attempted willful, deliberate, and premeditated murders of Carrillo and Espindola (§§ 664, subd. (a), 187, subd. (a)) and of shooting at an occupied motor vehicle (§ 246).[10] As to each offense, the jury further found Munoz personally and intentionally used and discharged a firearm (§ 12022.53, subds. (b), (c)); a principal personally and intentionally used and discharged a firearm, proximately causing great bodily injury to Carrillo (§ 12022.53, subds. (b), (c), (d), (e)(1)); and the offenses were committed for the benefit of, at the direction of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)(C)).[11] The trial court sentenced Munoz to two consecutive life terms, plus 50 years to life. It ordered him to

---

[10] Although there were four passengers in the Yukon, the People charged only two counts of attempted murder.

[11] The jury found Rojas not guilty of shooting at an occupied motor vehicle. It deadlocked on the vehicular manslaughter and attempted murder charges alleged as to Rojas, and the trial court declared a mistrial on those counts.

11

pay victim restitution and imposed a restitution fine, a suspended parole revocation restitution fine, a court operations assessment, and a criminal conviction assessment.  As noted, we affirmed Munoz's convictions, but vacated his sentence and remanded for resentencing.  Our Supreme Court granted review and has transferred the matter back to us with directions to reconsider the matter in light of Senate Bill 1437.

DISCUSSION

**[[**1.  *The evidence was sufficient to support the jury's finding that the attempted murders were willful, premeditated, and deliberate*

Munoz contends the evidence was insufficient to support the jury's findings that the attempted murders were willful, deliberate, and premeditated.  He argues that the "overwhelming force of the evidence" showed nothing more than a spontaneous and impulsive shooting occurring when Munoz's group unexpectedly encountered Espindola's group in the SUV.  We disagree.

When determining whether the evidence was sufficient to sustain a criminal conviction, we " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]" ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 242.)  We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  Reversal is not warranted unless it appears " ' "that upon no hypothesis whatever is there sufficient substantial evidence to

12

support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  The same standard of review applies when the prosecution relies primarily on circumstantial evidence.  (*Salazar*, at p. 242.)

Attempted murder requires the specific intent to kill and commission of a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Perez* (2010) 50 Cal.4th 222, 229.)  Premeditation and deliberation require more than a showing of intent to kill.  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)  An attempted murder is premeditated and deliberate when it occurs as the result of preexisting thought and reflection, rather than an unconsidered or rash impulse.  (*People v. Pearson* (2013) 56 Cal.4th 393, 443; *People v. Burney* (2009) 47 Cal.4th 203, 235.)  "Deliberate" means formed, arrived at, or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)  "Premeditation" means thought over in advance.  (*People v. Solomon* (2010) 49 Cal.4th 792, 812; *People v. Disa* (2016) 1 Cal.App.5th 654, 664.)  However, to prove a killing was premeditated and deliberate, it is " 'not . . . necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act.' [Citation.]"  (*Disa*, at p. 665.)  The " ' "process of premeditation and deliberation does not require any extended period of time." ' "  (*People v. Salazar*, *supra*, 63 Cal.4th at p. 245.)  " ' " 'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" [Citation.]' "  (*Houston*, at p. 1216.)

13

A reviewing court typically considers three categories of evidence when determining whether a finding of premeditation and deliberation is adequately supported: planning activity, motive, and manner of killing. (*People v. Houston, supra*, 54 Cal.4th at p. 1216; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663–664.) These so-called *Anderson* factors are not exclusive, but are a framework to guide the assessment of whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. (*People v. Gonzalez*, at p. 663; *People v. Solomon, supra*, 49 Cal.4th at p. 812.)

Here, there was evidence of all three *Anderson* factors. First, the evidence demonstrated a motive for the shooting. Munoz and Loaiza were members of the Pico Viejo gang, and Espindola, Carrillo, and Perez were members of Pico Viejo's "bitter enem[y]," Brown Authority. In his conversation with the confidential informant, Munoz stated he believed the victims were Brown Authority members, who had chased or shot at his cousin, Loaiza. The gang expert testified that gang members are expected to protect their territory, including "eliminating rivals in their territory." Both gangs claimed Streamland Park as their territory. (See *People v. Romero* (2008) 44 Cal.4th 386, 401 [evidence of motive shown where victim and defendant were members of rival gangs, and killing a gang rival would elevate the killer's status]; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413 [motive for shooting involved gang rivalry]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001; *People v. Wells* (1988) 199 Cal.App.3d 535, 541 [gang rivalry was motive for shooting where defendant and victim were members of rival gangs].)

Second, there was evidence of planning, in that both Loaiza and Munoz brought loaded guns with them in the car. (*People v. Salazar*, *supra*, 63 Cal.4th at p. 245 ["defendant brought a loaded gun with him to the Beef Bowl, demonstrating preparation"]; *People v. Lee* (2011) 51 Cal.4th 620, 636 ["defendant brought a loaded handgun with him on the night [of the killing], indicating he had considered the possibility of a violent encounter"]; *People v. Romero*, *supra*, 44 Cal.4th at p. 401 [evidence of planning shown by facts defendant brought gun to a store and shot victim in the back of the head]; *People v. Wells*, *supra*, 199 Cal.App.3d at pp. 540–541 [carrying concealed, loaded handgun "is consistent with intent to kill a rival gang member even it if does not provide solid evidence of prior planning to kill this particular victim"].)

And, third, the manner of killing showed premeditation. Loaiza fired multiple shots directly at the victims' vehicle; Munoz attempted to do so, but his gun jammed. Thus, the men acted in concert to attack their perceived enemies. According to Espindola's statements, the shooting was an ambush, and according to both him and Carrillo, no one in the SUV shot at the Mitsubishi or had a gun. This account was corroborated by the fact that the SUV was hit with multiple bullets, whereas the Mitsubishi was not. (See *People v. Bolin* (1998) 18 Cal.4th 297, 332 [firing multiple gunshots at victims supported finding of premeditation]; cf. *People v. Romero*, *supra*, 44 Cal.4th at p. 401 [evidence of execution style killing, without a struggle by the victim, indicates premeditation and deliberation].) This unprovoked shooting at close range suggested premeditation and deliberation. In short, the evidence was sufficient. (See *People v. Romero*, at p. 401; *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1266.)

15

Munoz argues that the "only evidence" relating to his and Loaiza's actions immediately preceding the shooting was Rojas's testimony that he picked the men up and they unexpectedly encountered the SUV; there was "basically no evidence" of planning; and the shooting was "spontaneous" and reflexive. Not so. Munoz's statements to the confidential informant suggested the encounter was not unexpected: his group went looking for the Brown Authority gang rivals who had accosted Loaiza, or at the very least, recognized them and shot when the two cars passed by. Loaiza's statement upon seeing the SUV, " 'those are those fools right there,' " likewise demonstrated such recognition. The fact both Munoz and Loaiza coordinated the attack was inconsistent with a finding the shooting was unplanned and spontaneous, as was the fact they each brought a loaded gun in the car. Further, Espindola testified his group was unarmed and did not shoot, undercutting the argument that Munoz's and Loaiza's actions were simply reflexive. Even assuming Munoz's group was not seeking out Espindola's group, the evidence was sufficient to show that, once they happened upon them, the shooting was premeditated, willful, and deliberate. "Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief." (*People v. Sanchez* (2001) 26 Cal.4th 834, 849; *People v. Rand*, *supra*, 37 Cal.App.4th at pp. 1001–1002 [sufficient evidence of premeditation where defendant committed a drive-by shooting, aiming at stranded persons whom he believed were rival gang members; "[t]he law does not require that an action be planned for any great period of time in advance" and a " 'cold and calculating decision to kill can be arrived at very quickly' "].)

16

### 2. *The trial court did not commit instructional error*
#### a. *Additional facts and contentions*

Munoz argues that the trial court misinstructed the jury regarding the mental state required for an aider and abettor convicted of premeditated attempted murder under the natural and probable consequences doctrine.

The prosecutor argued that Munoz could be found guilty of premeditated attempted murder if he personally committed the premeditated attempted murders of the victims, or, alternatively, if he aided and abetted the target crime of firing at an occupied vehicle and attempted murder was a natural and probable consequence of that offense. As to the premeditation allegation, the prosecutor explained, "What you're looking at is not just whether the individual defendant formed that specific intent but whether any of the principals, meaning defendant Rojas, defendant Munoz, or the decedent, Jonathan Loaiza, committed that attempted murder with specifically the intent to do so willfully, deliberately, and with premeditation."

The trial court instructed the jury on attempted murder, aiding and abetting, the natural and probable consequences doctrine, and premeditation and deliberation. Consistent with the prosecutor's argument, CALCRIM No. 601 stated that, to establish the premeditation allegation, the People had to prove that either Munoz, Rojas or Loaiza, or all of them, committed the attempted murder willfully and with deliberation and premeditation.[12]

---

[12]     CALCRIM No. 402 stated, in pertinent part: "To prove that the defendant is guilty of attempted murder under the doctrine of natural and probable consequences, the People must prove that: [¶] 1.  The defendant is guilty of shooting at an occupied vehicle;

17

Munoz complains that the jury should have been instructed that the premeditation allegation could be found true as to him only if *premeditated* attempted murder—rather than *unpremeditated* attempted murder—was a natural and probable consequence of the target offense of shooting at an occupied motor vehicle. He argues that this purported flaw in the instructions eliminated an element from the jury's consideration in violation

---

[¶] 2. During the commission of shooting at an occupied vehicle a coparticipant in that shooting at an occupied vehicle committed the crime of attempted murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of *attempted murder was a natural and probable consequence of the commission of the shooting at an occupied vehicle.* [¶] . . . [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." (Italics added.)

CALCRIM No. 601 stated, in pertinent part: "If you find the defendant guilty of attempted murder under Count 1 and/or Count 2, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] The defendant or Jonathan Loaiza acted willfully if he intended to kill when he acted. The defendant or Jonathan Loaiza deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant or Jonathan Loaiza acted with premeditation if he decided to kill before completing the acts of attempted murder. [¶] *The attempted murder was done willfully and with deliberation and premeditation if either one of the defendant* [sic] *or Jonathan Loaiza or all of them acted with that state of mind.*" (Italics added.)

18

of his Sixth and Fourteenth Amendment rights.  Because it is unclear, based on the record, including the verdict forms, which theory the jury relied upon in rendering its verdict, he contends the purported instructional error requires reversal of the jury's findings that the two attempted murders were premeditated, willful, and deliberate.

        b.  *Standard of review and applicable legal principles*

A trial court has the duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Townsel* (2016) 63 Cal.4th 25, 58.)  We independently determine whether the instructions given were correct and adequate.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Riley* (2010) 185 Cal.App.4th 754, 767.)

As we explain in the published portion of this opinion, after Munoz was tried and sentenced, the Legislature amended the law as it pertains to the natural and probable consequences doctrine. (Sen. Bill 1437, Stats. 2018, ch. 1015, §§ 2—3.)  Because we determine *post* that these amendments do not retroactively apply to Munoz, Senate Bill 1437 does not affect our analysis of his instructional error claims, and we consider the law as it stood at the time of trial.

Prior to enactment of Senate Bill 1437, there were "two distinct forms of culpability for aiders and abettors." (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*).)  First, to be liable as a direct aider and abettor to murder, the prosecution must show the defendant aided or encouraged the commission of the murder with knowledge of the perpetrator's unlawful purpose, and with the intent or purpose of committing, encouraging, or facilitating its commission.  (*Id.* at pp. 166–167.)  Consequently, the aider

19

and abettor must have had the intent to kill. (*People v. Lee* (2003) 31 Cal.4th 613, 624 (*Lee*).) Second, under the law as it previously stood, under the natural and probable consequences doctrine, a " ' "person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime," ' " that is, that was reasonably foreseeable. (*Chiu*, at p. 161.) " 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' " (*Ibid*.)

In *Lee*, the defendant, who was tried for attempted, premeditated murder as a direct aider and abettor, argued section 664[13] required that an attempted murderer must personally act with willfulness, deliberation, and premeditation, and that the trial court erred by failing to so instruct the jury. (*Lee*, *supra*, 31 Cal.4th at pp. 616, 618, 621–623.) The *Lee* court disagreed, concluding that based on the statutory language, "section 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted willfully and with deliberation and premeditation, even if he or she is guilty as an aider and abettor." (*Id.* at p. 616.)

---

[13] Under section 664, subdivision (a), a person guilty of attempted murder generally will be punished by a term of five, seven, or nine years. However, if the People plead and prove that the attempted murder was willful, deliberate, and premeditated, the punishment is life in prison. (*Lee*, *supra*, 31 Cal.4th at p. 616; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 82 (*Gallardo*).)

*People v. Favor* (2012) 54 Cal.4th 868, came to the same conclusion when a defendant was tried under the natural and probable consequences theory, holding that "the jury need not be instructed that a premeditated attempt to murder must have been a natural and probable consequence of the target offense." (*Id.* at p. 872.) *Favor* reasoned that section 664, subdivision (a), did not create a greater degree of attempted murder, but constituted a penalty provision that prescribes an increased punishment. (*Favor*, at pp. 876–877.) The court explained: "Because section 664(a) 'requires only that the attempted murder itself was willful, deliberate, and premeditated' [citation], it is only necessary that the attempted murder 'be committed by one of the perpetrators with the requisite state of mind.' [Citation.] . . . [W]ith respect to the natural and probable consequences doctrine as applied to the premeditation allegation under section 664(a), attempted murder—not attempted premeditated murder—qualifies as the nontarget *offense* to which the jury must find foreseeability. Accordingly, once the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated. [¶] Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*Favor*, at pp. 879–880.)

21

c. *The instructions given were not erroneous*

In light of the foregoing, it is clear the trial court did not commit instructional error. Attempted murder—not attempted premeditated murder—qualified as the nontarget offense, and the jury need not be instructed that a premeditated attempt to murder must have been a natural and probable consequence of the target offense. (*Favor*, *supra*, 54 Cal.4th at p. 872.)

Munoz acknowledges that *Favor* is "directly on point" and would normally compel rejection of his argument. However, he contends *Favor* has been undermined by the United States Supreme Court's opinion in *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*) and by our Supreme Court's decision in *Chiu*.

*Alleyne* held, based on *Apprendi v. New Jersey* (2000) 530 U.S. 466, that any fact that increases the penalty for a crime is an element and must be submitted to the jury and found true beyond a reasonable doubt. (*Alleyne*, *supra*, 570 U.S. at p. 103.) The high court explained, "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." (*Id.* at p. 114.)

Subsequently, *Chiu* held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Chiu*, *supra*, 59 Cal.4th at pp. 158–159.) The court reasoned that in the context of murder, the natural and probable consequences doctrine serves the policy goal of deterring aiders and abettors from encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. (*Id.* at p. 165.) This policy goal, however, loses

22

its force in the context of a defendant's liability as an aider and abettor to a first degree premeditated murder, for at least two reasons: the premeditative mental state is "uniquely subjective and personal," and the resultant harm is the same regardless of whether the perpetrator premeditated. (*Id.* at p. 166.) *Chiu* concluded that "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime" based on the natural and probable consequences doctrine. (*Ibid.*) *Chiu* declined to overrule *Favor*, distinguishing it instead on the basis that (1) premeditation and deliberation are elements of first degree murder, whereas premeditation and deliberation simply increase the penalty for attempted premeditated murder; (2) *Favor*, but not *Chiu*, involved a question of legislative intent; and (3) the consequences of imposing liability for premeditated attempted murder are less severe than for first degree premeditated murder. (*Chiu*, at p. 163.)

Munoz argues that, in light of *Alleyne*, *Favor*'s reasoning that section 664, subdivision (a) is merely a penalty provision, rather than the functional equivalent of a greater offense, cannot stand. Further, he avers that the bases upon which *Chiu* distinguished *Favor* are "clearly contrary to *Alleyne*'s reasoning and holding."

We reject Munoz's argument for two reasons. As *People v. Gallardo, supra*, 18 Cal.App.5th 51 explained: "*Alleyne* was decided approximately one year before *Chiu*. Although *Chiu* addressed *Lee* and *Favor* at length, it did not mention *Alleyne*, or provide any indication that *Alleyne* had undermined its prior holdings in those cases. We presume the Supreme Court was aware of *Alleyne* when it issued *Chiu*. [¶] Moreover, at least as

23

applied in this case, we fail to see how section 664, subdivision (a)'s sentencing enhancement for attempted premeditated murder violates the rule of *Alleyne*. Under the statute, a defendant cannot be subjected to the enhanced penalty provision unless the jury finds two facts beyond a reasonable doubt: (1) the defendant committed an attempted murder; and (2) the defendant or his accomplice committed the attempted murder with premeditation. . . . Thus, an enhanced penalty cannot be imposed under section 664, subdivision (a) unless the jury makes a true finding on the question of premeditation." (*Id.* at pp. 85–86, fn. omitted.) We agree with *Gallardo*'s reasoning and adopt it here.

Second, and more fundamentally, at present *Favor* remains good law. Our Supreme Court previously granted review in *People v. Mateo*, *supra*, S232674, to consider the following issue: "In order to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, must a premeditated attempt to murder have been a natural and probable consequence of the target offense? In other words, should *People v. Favor* (2012) 54 Cal.4th 868 be reconsidered in light of *Alleyne v. United States* (2013) __ U.S. __ [113 S.Ct. 2151] and *People v. Chiu* (2014) 59 Cal.4th 155?" (<http://appellatecases.courtinfo.ca.gov> [as of Sep. 6, 2019].) The court subsequently transferred the matter back to the Court of Appeal with directions to vacate its decision and reconsider the cause in light of Senate Bill 1437, without deciding the issue. Therefore, the question posed in *Mateo* remains unanswered. Unless and until our Supreme Court

24

overrules *Favor*, it precludes Munoz's argument.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[14]]]

   3.  *Senate Bill 1437*

   Senate Bill 1437, which took effect on January 1, 2019, "addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine[.]" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722 (*Martinez*).) Prior to Senate Bill 1437's enactment, a person who knowingly aided and abetted a crime, the natural and probable consequence of which was murder or attempted murder, could be convicted of not only the target crime but also of the resulting murder or attempted murder.  (*People v. Chiu* (2014) 59 Cal.4th 155, 161; *In re R.G.* (2019) 35 Cal.App.5th 141, 144.)  "This was true irrespective of whether the defendant harbored malice aforethought.  Liability was imposed ' "for the criminal harms [the defendant] . . . naturally, probably, and foreseeably put in motion." [Citations.]' [Citation.]" (*In re R.G.*, at p. 144.)  Aider and abettor liability under the natural and probable consequences doctrine was thus "vicarious in nature."  (*Chiu*, at p. 164.)

   Senate Bill 1437 "redefined 'malice' in section 188.  Now, to be convicted of murder, a principal must act with malice aforethought; malice can no longer 'be imputed to a person based solely on [his or her] participation in a crime.'  (§ 188, subd. (a)(3).)" (*In re R.G.*, *supra*, 35 Cal.App.5th at p. 144.) Senate Bill 1437 also amended section 189, which defines first and second degree murder, by, among other things, adding

---

[14]     In light of our conclusion, we find it unnecessary to reach the parties' arguments regarding prejudice.

subdivision (e).  Under that subdivision, a participant in enumerated crimes is liable under the felony murder doctrine only if he or she was the actual killer; or, with the intent to kill, aided and abetted the actual killer in commission of first degree murder; or was a major participant in the underlying felony and acted with reckless indifference to human life.[15]  (§ 189, subd. (e); Stats. 2018, ch. 1015, § 3; *People v. Lopez* (Aug. 21, 2019, B271516) [2019 Cal.App. Lexis 773, pp. *16–*17, *23–*24, & fn. 9].)  Senate Bill 1437 thus ensures that murder liability is not imposed on a person who did not act with implied or express malice, was not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.  (Stats. 2018, ch. 1015, § 1, subds. (f), (g); *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147.)

Senate Bill 1437 also added section 1170.95, which permits persons convicted of murder under a felony murder or natural and probable consequences theory to petition in the sentencing court for vacation of their convictions and resentencing, if certain conditions are met.  (Stats. 2018, ch. 1015, § 4; *Martinez, supra,* 31 Cal.App.5th at p. 723.)  An offender may file a section 1170.95 petition if (1) a complaint, information, or indictment was filed against him or her "that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; (2) he or she was convicted of first or second degree murder following a trial or plea; and (3) under sections 188 or 189, as amended by Senate Bill 1437, he

---

[15]    Subdivision (e) is inapplicable when the victim is a peace officer, under specified circumstances.  (§ 189, subd. (f).)

or she could not have been convicted of first or second degree murder.  (§ 1170.95, subd. (a).)  If the petitioner makes a prima facie showing that he or she is entitled to relief, the trial court must issue an order to show cause and, absent a waiver and stipulation by the parties, hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously . . . sentenced, provided that the new sentence, if any, is not greater than the initial sentence."[16]  (§ 1170.95, subds. (c), (d)(1); *Martinez*, at pp. 723—724.)  At that hearing, the prosecution has the burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing.  Both the prosecution and the defense may rely on the record of conviction or may offer new or additional evidence.  (§ 1170.95, subd. (d)(3).)  If the prosecution "fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (*Ibid*.)  If the murder was charged generically, and no target offense was charged, the petitioner's conviction must be redesignated as the target offense or underlying felony for resentencing purposes.  (*Id.*, subd. (e).)

Relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), Munoz contends that Senate Bill 1437's ameliorative provisions apply retroactively to him on direct appeal, and he is entitled to

---

[16]    Section 1170.95, subdivision (d)(2) provides that the "parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing."

27

"seek relief through the direct appeal process rather than having to submit to the . . . section 1170.95 petition process." The People disagree. They contend that (1) under Senate Bill 1437, a defendant must seek relief via the section 1170.95 petitioning procedure, rather than on direct appeal; and (2) Senate Bill 1437 applies only to persons convicted of murder, not attempted murder. The People are correct on both points.

a. *Senate Bill 1437 does not apply retroactively to cases pending on appeal*

Generally, penal statutes do not operate retroactively. (§ 3; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307 (*Lara*); *People v. Brown* (2012) 54 Cal.4th 314, 319, 324.) But, under the rule of *Estrada*, a statute lessening punishment is presumed to apply to cases that are not yet final on the statute's effective date, unless the Legislature clearly signals its intent to make the amendment prospective, either by including an express saving clause or its equivalent. (*Estrada, supra*, 63 Cal.2d at pp. 744, 745—748; *Lara*, at pp. 307—308; *People v. DeHoyos* (2018) 4 Cal.5th 594, 600 (*DeHoyos*); *Martinez, supra*, 31 Cal.App.5th at pp. 724—725.)

A petitioning procedure like that created by section 1170.95 amounts to just such an indication that the Legislature intended an ameliorative provision to apply prospectively only. When the Legislature creates a statutory procedure by which defendants may avail themselves of a change in the law, that remedy must be followed and relief is not available on direct appeal. As several recent authorities recognize, this means that Senate Bill 1437 should "not be applied retroactively to nonfinal convictions on direct appeal." (*Martinez, supra*, 31 Cal.App.5th at p. 727.)

28

Proposition 36, the Three Strikes Reform Act of 2012, and Proposition 47, the Safe Neighborhoods and Schools Act, both created postconviction procedures by which defendants could seek resentencing for offenses that, due to changes wrought by those propositions, might be available to them. (§§ 1170.126, 1170.18.) In *People v. Conley* (2016) 63 Cal.4th 646 (*Conley*) and *DeHoyos*, *supra*, 4 Cal.5th 594, our Supreme Court concluded the new laws were not retroactive on direct appeal. (*Conley*, at pp. 661—662; *DeHoyos*, at p. 597.) The section 1170.126 and 1170.18 resentencing procedures did not distinguish between persons serving final and nonfinal sentences, and resentencing was subject to the trial court's assessment of a defendant's public safety risk. (*Conley*, at pp. 657, 658; *DeHoyos*, at p. 603.) The propositions were therefore not silent on the question of retroactivity, and the *Estrada* presumption did not apply. (*Conley*, at pp. 657—659; *DeHoyos*, at pp. 597, 602—603.)

*Martinez* concluded the same is true in regard to Senate Bill 1437. "The analytical framework animating the decisions in *Conley* and *DeHoyos* is equally applicable here. Like Propositions 36 and 47, Senate Bill 1437 is not silent on the question of retroactivity. Rather, it provides retroactivity rules in section 1170.95. The petitioning procedure specified in that section applies to persons who have been convicted of felony murder or murder under a natural and probable consequences theory. It creates a special mechanism that allows those persons to file a petition in the sentencing court seeking vacatur of their conviction and resentencing. In doing so, section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not. That the Legislature specifically created this mechanism, which facially applies to both final and

29

nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal." (*Martinez*, *supra*, 31 Cal.App.5th at p. 727.)  That section 1170.95 provided the parties with the opportunity to "go beyond the original record in the petition process, a step unavailable on direct appeal," also provided "strong evidence the Legislature intended for persons seeking the ameliorative benefits of Senate Bill 1437 to proceed via the petitioning procedure.  The provision permitting submission of additional evidence also means Senate Bill 1437 does not categorically provide a lesser punishment must apply in all cases, and it also means defendants convicted under the old law are not necessarily entitled to new trials.  This, too, indicates the Legislature intended convicted persons to proceed via section 1170.95's resentencing process rather than avail themselves of Senate Bill 1437's ameliorative benefits on direct appeal." (*Martinez*, at pp. 727–728; accord, *People v. Lopez*, *supra*, 2019 Cal.App. Lexis 773 at pp. *42–*45; *In re R.G.*, *supra*, 35 Cal.App.5th at pp. 145–146; *People v. Anthony*, *supra*, 32 Cal.App.5th at pp. 1147–1153; *In re Taylor* (2019) 34 Cal.App.5th 543, 561–562.)  We agree with the foregoing analysis.

Attempting to circumvent this result, Munoz argues that the petition procedures implemented by Propositions 36 and 47 are different than that created by Senate Bill 1437.  In enacting Propositions 36 and 47, the electorate limited relief to statutorily defined defendants, i.e., those who had not suffered disqualifying convictions, and whom the trial court found would not present an unreasonable risk to public safety if released.  In contrast, he argues, the Legislature intended Senate Bill 1437 to unconditionally apply to "all natural and probable consequences

30

murder defendants." Because no additional fact finding is necessary to determine Senate Bill 1437 eligibility, he reasons, *Conley* and *DeHoyos* are distinguishable.

We disagree. As *Martinez* explained when rejecting one of the same contentions, although section 1170.95 does not require a dangerousness inquiry, neither *Conley* nor *DeHoyos* held that inquiry was the "indispensable statutory feature on which the result in those cases turned." (*Martinez, supra*, 31 Cal.App.5th at p. 728.) And, Munoz's contention that no additional fact finding is required in order to apply section 1170.95 is simply incorrect. Senate Bill 1437 does not categorically provide that a lesser punishment must apply in all cases. (*Martinez*, at p. 728; *People v. Anthony, supra*, 32 Cal.App.5th at p. 1153 [Senate Bill 1437 "does not provide automatic retroactive relief to convicted defendants any more than do Proposition 36 and Proposition 47"].) Instead, a trial court is required, when ruling on a section 1170.95 petition, to determine whether the petitioner could not have been convicted of first or second degree murder under sections 188 and 189, as amended by Senate Bill 1437. (§ 1170.95, subds. (a)(3), (d)(3).) At the section 1170.95 hearing, the People have the burden of proof—based on the record of conviction or new or additional evidence—to show that the petitioner is ineligible for relief. (§ 1170.95, subd. (d)(3).) This procedure obviously requires factual findings on the question of the nature and extent of the petitioner's participation in the crime or crimes. Reading the law as Munoz suggests would bypass the section 1170.95 fact finding process that is, in most cases, a predicate to relief under Senate Bill 1437.[17]

---

[17] If a court or a jury previously found the petitioner did not act with reckless indifference to human life or was not a major

31

Munoz's citation to a variety of cases in which the *Estrada* presumption applied is unavailing.[18]  None of these authorities "involves or grapples with the legislative enactment of a specific procedure for the consideration of retroactive relief of a change in the law.  They are thus inapposite." (*People v. Anthony*, *supra*, 32 Cal.App.5th at p. 1155 & fn. 48.)

       b. *Senate Bill 1437 does not apply to attempted murder convictions*

Munoz is not entitled to relief pursuant to Senate Bill 1437 for a second reason:  Senate Bill 1437 does not apply to the offense of attempted murder.  (See *People v. Lopez, supra*, 2019 Cal.App. Lexis 773 at pp. *24—*28.)

In any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent, so as to effectuate the law's purpose.  We begin with an examination of the statute's words, giving them their usual and ordinary meaning, because they generally provide the most reliable indicator of legislative intent.  (*People v. Colbert* (2019) 6 Cal.5th 596, 603; *People v. Ruiz* (2018) 4 Cal.5th 1100, 1105—1106.)  If not ambiguous, the plain meaning of the statutory language controls, and we need go no further.  (*Colbert*, at p. 603; *Ruiz*, at p. 1106; *In re C.H.* (2011) 53 Cal.4th 94, 100, 107.)  If the

---

participant in the felony, the trial court must vacate the conviction and resentence the petitioner.  (§ 1170.95, subd. (d)(2).)

[18]    These cases include *Lara, supra*, 4 Cal.5th 299; *People v. Babylon* (1985) 39 Cal.3d 719; *People v. Rossi* (1976) 18 Cal.3d 295; *People v. Millan* (2018) 20 Cal.App.5th 450; and *People v. Eagle* (2016) 246 Cal.App.4th 275.

statutory language supports more than one reasonable interpretation, we may look to extrinsic aids, including the legislative history and the objects to be achieved by the legislation.  (*Ruiz*, at p. 1106.)

As explained, Senate Bill 1437 amended two statutes, sections 188 and 189, and added section 1170.95.  The plain language of each of these enactments compels the conclusion that Senate Bill 1437 pertains only to murder, not attempted murder.

Section 188, subdivision (a)(3), now states that "in order to be *convicted of murder*, a principal in a crime shall act with malice aforethought."  (Italics added.)

Newly added subdivision (e) of section 189 provides that a participant in enumerated offenses "*in which a death occurs is liable for murder* only if one of the following is proven:  [¶] (1) The person was the actual *killer*.  [¶] (2) The person was not the actual *killer*, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual *killer* in the commission of *murder in the first degree*." (Italics added.)

Subdivision (a) of newly added section 1170.95 states that a "person convicted of *felony murder or murder under a natural and probable consequences theory*" may petition to have his or her "*murder conviction* vacated" and for resentencing.  (Italics added.)  To establish entitlement to relief, the petitioner must show he or she was charged with *murder*; was convicted of *first degree or second degree murder*; and could not have been convicted of *first or second degree murder* due to changes to sections 188 or 189 wrought by Senate Bill 1437.  (§ 1170.95, subd. (a), italics added.)  The remainder of section 1170.95 likewise speaks only in terms of murder, not attempted murder.

33

Thus, Senate Bill 1437 is not ambiguous; by its plain terms, it does not extend to Munoz's offense of attempted murder. (See *People v. Jillie* (1992) 8 Cal.App.4th 960, 963 ["We do not find the statute ambiguous. It expressly identifies the offenses within its scope, all of which are completed offenses. Had the Legislature meant to include attempts among the covered offenses, it could easily have done so"].) Indeed, examining the plain statutory language, our colleagues in Division Seven recently came to the same conclusion. (*People v. Lopez*, *supra*, 2019 Cal.App. Lexis 773 at pp. *24—*26.)

Munoz makes several attempts to sidestep the import of the statutory language, but none is persuasive. He hypothesizes that the omission of attempted murder from the bill was inadvertent. The Legislature was primarily focused on the felony murder rule, he asserts, and because there is no crime of attempted felony murder, it simply neglected to include attempted murder when addressing the natural and probable consequences doctrine. (See *People v. Billa* (2003) 31 Cal.4th 1064, 1071, fn. 4 ["California has no crime of attempted felony murder"]; *People v. Brito* (1991) 232 Cal.App.3d 316, 321.)

It is true that the various committee analyses of the bill focused primarily on the felony murder rule, but they also mentioned the natural and probable consequences doctrine. (See, e.g., Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 1437 (2017—2018 Reg. Sess.) April 24, 2018, p. 3; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1437 (2017—2018 Reg. Sess.) as amended May 25, 2018, p. 3.) The initial draft of the legislation included the provision that a defendant could request resentencing when the charging document allowed the prosecution to proceed on a theory of felony

34

murder *or* "murder under the natural and probable consequences doctrine." (Sen Bill. 1437, § 6 (2017—2018 Reg. Sess.) as introduced Feb. 16, 2018.) *People v. Lopez* points out that a year before Senate Bill 1437's enactment, the Legislature adopted a concurrent resolution recognizing that reform was needed " 'to limit convictions and subsequent sentencing in both felony murder cases and aider and abettor matters prosecuted under [the] "natural and probable consequences" doctrine . . . .' " (*People v. Lopez, supra*, 2019 Cal.App. Lexis 773 at p. *14 [citing Senate Concurrent Resolution No. 48 (2017—2018 Reg. Sess.) resolution chapter 175].) The resolution "observed that the natural and probable consequences doctrine 'result[s] in individuals lacking the mens rea and culpability for murder being punished as if they were the ones who committed the fatal act.' " (*People v. Lopez*, at pp. *14—*15.)

Given that the Legislature was clearly aware of the natural and probable consequences doctrine, included it in the 2017 resolution and the original draft of the bill, and drafted Senate Bill 1437 using clear statutory language, we cannot simply assume the omission of attempted murder was a mistake. "We are compelled to add language only in extreme cases where, as a matter of law, we are convinced that the Legislature, through inadvertence, failed to utilize the word or words which give purpose to its pronouncements." (*People v. Buena Vista Mines, Inc.* (1996) 48 Cal.App.4th 1030, 1034; *People v. Guzman* (2005) 35 Cal.4th 577, 587 [we do not lightly assume drafting error].) Where the words of the statute are clear, we are not at liberty to add to or alter them to accomplish a purpose that is not apparent on the face of the statute or in its legislative history. (*People v. Lightsey* (2012) 54 Cal.4th 668, 692; *Guzman*, at p. 587 [inserting

35

additional language into a statute violates the cardinal rule of statutory construction that courts must not add provisions to statutes].)[19]

In a related vein, Munoz argues that the literal language of Senate Bill 1437 should not be given effect because such an interpretation would lead to absurd results and undermine the Legislature's intent. He posits that construing Senate Bill 1437 to apply to murder, but not attempted murder, will result in "absurdly disparate" sentencing consequences for the same conduct, with persons convicted of the lesser offense of attempted murder serving longer sentences than those convicted of murder.[20]

---

[19] *In re R.G.* recently concluded that section 1170.95's petitioning procedure is available to juveniles, even though nothing in the text of Senate Bill 1437 expressly references juveniles and section 1170.95 uses language not generally applicable in juvenile proceedings. (*In re R.G.*, *supra*, 35 Cal.App.5th at pp. 144, 146—147.) The court's holding was premised on several considerations specific to the juvenile law, including, inter alia, that provisions of the Welfare and Institutions Code specifically contemplate incorporating substantive criminal laws into juvenile proceedings, and excluding juveniles from section 1170.95's reach could run afoul of the requirement that a juvenile may not be held in physical confinement for a period exceeding that which could be imposed upon an adult convicted of the same offense. (*In re R.G.*, at pp. 148—151.) We do not disagree with *In re R.G.*, but as is readily apparent, the considerations underpinning the decision there do not apply here.

[20] Munoz argues that attempted murder is a lesser included offense of murder. (See *People v. Davidson* (2008) 159 Cal.App.4th 205, 210 ["Attempted murder is a lesser included

Munoz is correct that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend, or would frustrate the purpose of the legislation as a whole. (See, e.g., *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290; *People v. Valencia* (2017) 3 Cal.5th 347, 358, 362; *Switzer v. Wood* (2019) 35 Cal.App.5th 116, 129; *People v. Morales* (2019) 33 Cal.App.5th 800, 806 [the literal meaning of the words of a statute may be disregarded to avoid absurd results].) But these principles do not help Munoz because it is apparent that the Legislature *did* intend to exclude attempted murder from Senate Bill 1437's reach, and the consequences of that legislative choice are not clearly absurd.

---

offense of murder"]; *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 609 ["California appellate courts have repeatedly accepted the principle that attempt is a lesser included offense of any completed crime"].) The People disagree, pointing to *People v. Bailey* (2012) 54 Cal.4th 740, wherein our Supreme Court observed: " '[t]he law of "attempt" is complex and fraught with intricacies and doctrinal divergences' " and is therefore not subject to generalizations. (*Id.* at p. 753.) Despite *In re Sylvester C.* and other cases, *Bailey* concluded that the principle that attempt is a lesser included offense of any completed crime was "not applicable . . . where the attempted offense includes a particularized intent that goes beyond what is required by the completed offense." (*Bailey*, at pp. 752—753; see *People v. Fontenot* (Aug. 26, 2019, S247044) [2019 Cal. Lexis 6238, pp. *11—*12, *24—*25] [attempted kidnapping is not a lesser included offense of completed kidnapping for purposes of section 207, subd. (a)].) We do not decide the question, but assume for purposes of this appeal that attempted murder is a lesser included offense of murder.

First, all indications are that the exclusion of attempted murder was intentional.  The statute's uncodified statement of legislative findings and declarations provides:  "(f) It is necessary to amend the felony murder rule and the *natural and probable consequences doctrine, as it relates to murder*, to ensure that *murder liability* is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.  [¶]  (g) Except as stated in subdivision (e) of Section 189 of the Penal Code, *a conviction for murder* requires that a person act with malice aforethought.  A person's *culpability for murder* must be premised upon that person's own actions and subjective mens rea."  (Stats. 2018, ch. 1015, § 1, italics added; *People v. Canty* (2004) 32 Cal.4th 1266, 1280 [statements of purpose and intent may be used as an aid in construing legislation]; *People v. Valencia*, *supra*, 3 Cal.5th at p. 362.)  The repeated references to "murder," and murder alone, are telling.  Even more significant is the statement that amendment of the natural and probable consequences doctrine was necessary "as it relates to murder."  This phrasing indicates the express intent to exclude attempted murder from Senate Bill 1437's reach.

That the Legislature intentionally excluded attempted murder is also shown by its use of the term "attempted" in section 189, subdivision (e).  The Legislature expressly specified that the underlying felony could be either completed or attempted.  But, it omitted the word "attempted" from the same sentence when addressing the participant's liability for murder.  (§ 189, subd. (e) ["A participant in the perpetration or *attempted perpetration* of a felony listed in subdivision (a) in which a death occurs *is liable*

38

*for murder* only if one of the following is proven," italics added].) " 'When the Legislature "has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded." ' [Citation.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 880; *People v. Bland* (2002) 28 Cal.4th 313, 337.) And, when the Legislature wishes a statute to encompass both a completed crime and an attempt, it knows how to say so. (See, e.g., §§ 12022.53, subd. (a)(18); 12022, subd. (a)(1); 667.5, subd. (c)(12); 1192.7, subd. (c)(22), (39).) The inescapable conclusion from the foregoing is that the Legislature intended to exclude attempted murder from Senate Bill 1437's ambit.

Nor is any absurdity apparent. Contrary to the central premise underlying Munoz's arguments, it is far from clear that interpreting Senate Bill 1437 to apply to convictions for murder, but not attempted murder, will always, or typically, result in longer sentences for the latter. Senate Bill 1437 does not mandate any particular punishment for either murder or attempted murder. The penalties for these crimes are prescribed in other statutes, and, as we explain in more detail in regard to Munoz's equal protection claim, the basic punishment for attempted murder is far less severe than that imposed for murder. (*People v. Chiu, supra*, 59 Cal.4th at p. 163; §§ 664, subd. (a), 190, subd. (a).) Nor does applying the statute's plain language undermine the primary legislative goal of making punishment commensurate with culpability, because the punishment for attempted murder was already, prior to Senate Bill 1437's enactment, less than that imposed for murder.

It is possible that, due to variables such as the applicability of sentencing enhancements, an attempted murderer *could* be punished with a sentence lengthier than that conceivably

imposed on a murderer who obtained section 1170.95 relief. But this fact does not trigger application of the absurdity exception. The "absurdity exception requires much more than [a] showing that troubling consequences may potentially result if the statute's plain meaning were followed or that a different approach would have been wiser or better. [Citations.] Rather, '[t]o justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them.' [Citation.] Moreover, our courts have wisely cautioned that the absurdity exception to the plain meaning rule 'should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government. [Citation.] We do not sit as a "super-legislature." [Citation.]' [Citation.]" (*Switzer v. Wood*, *supra*, 35 Cal.App.5th at p. 129; *People v. Morales*, *supra*, 33 Cal.App.5th at p. 806 [the absurdity doctrine should be used only in extreme cases]; *People v. Schoop* (2012) 212 Cal.App.4th 457, 470.)

In support of his contention that denying Senate Bill 1437 relief to attempted murderers is absurd, Munoz relies primarily upon *People v. King* (1993) 5 Cal.4th 59 (*King*) and *People v. Barrajas* (1998) 62 Cal.App.4th 926. In *King*, the court confronted a "sentencing anomaly" in which "a literal interpretation of interrelated statutes would have meant that some juveniles convicted of first degree murder would be eligible to be committed to the former California Youth Authority (CYA) rather than sentenced to state prison, but the same juveniles who merely *attempted* to commit first degree murder would be ineligible for such a commitment." (*People v. Cook* (2015) 60 Cal.4th 922, 938, fn. 2 [summarizing *King*].) Under former

40

section 1731.5 of the Welfare and Institutions Code, juveniles sentenced to imprisonment for life were ineligible for CYA commitment. (*King*, at p. 65.) After the Supreme Court interpreted "25 years to life" to be an indeterminate sentence, making first degree murderers eligible for CYA placement, the Legislature amended the Welfare and Institutions Code to partially "overrule[ ]" that decision, making 18-year-old first degree murderers ineligible, while impliedly reaffirming that first degree murderers under 18 remained eligible. (*Id.* at pp. 66–67.) Several years later, the Legislature amended the Penal Code to punish attempted first degree murder with a term of " 'life with the possibility of parole,' " language which was interpreted by appellate courts to render attempted murderers of any age ineligible. (*Id.* at pp. 65–67.) *King* held that the legislative history showed an intent that "both successful and intended first degree murderers under the age of 18" should be eligible. When the Legislature amended the punishment for attempted murder, "surely it did not intend to make attempted premeditated murderers that age ineligible for the same commitment. It did not intend a lesser included offense to have potentially harsher penal consequences than the greater offense. Defendant should not be penalized because one of his victims survived; he should not be made to regret not applying the coup de grace to that victim." (*Id.* at pp. 67, 69.) This "clear legislative intent," *King* explained, "should prevail over any irrational result caused by the amendment of different statutes in separate codes at different times for unrelated purposes." (*Id.* at p. 69.)

   *King* does not compel judicial amendment of Senate Bill 1437 for two reasons. First, Senate Bill 1437's plain language is not the result of a disjointed series of amendments over time, as

was the case in *King*, from which we might infer inadvertence or irrationality.  Instead, the relevant provisions are contained in a single cohesive bill.  (See *People v. Lopez*, *supra*, 2019 Cal.App. Lexis 773 at pp. *29–*30.)  Second, in *King* the effect of the series of amendments and judicial interpretations was stark:  first degree murderers under 18 were eligible for CYA, whereas persons of the same age who committed attempted murder were not.  Here, in contrast, Senate Bill 1437 does not mandate that persons convicted of attempted murder are punished more severely than persons convicted of murder.  Attempted murderers are statutorily subject to a lesser, not a greater, penalty than murderers.  Senate Bill 1437 does not require that attempted murderers receive a harsher sentence, or prohibit them from receiving a more lenient sentence, than murderers.  On its face, Senate Bill 1437 does not present the same clear-cut distinction as in *King*.

 *People v. Barrajas*—in which the court found a drug diversion statute applied to a defendant who had attempted to possess methamphetamine, despite the fact the statutory scheme listed possession, but not attempted possession, as a divertible offense—is distinguishable for the same reason.  (*People v. Barrajas*, *supra*, 62 Cal.App.4th at pp. 928—930.)  Senate Bill 1437 does not preclude an attempted murderer from being sentenced to a lesser term than a murderer.  To the extent a disparity might exist in an individual case, that circumstance is not sufficient to render the plain language of the statute absurd.  (See *Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 277 ["A sentencing disparity does not necessarily render a statutory scheme absurd because it is the Legislature's prerogative to affix punishment"].)  The remedy for any potentially inequitable

42

operation of section 1170.95 lies with the Legislature.  If the Legislature concludes it is unwise or inequitable to exclude attempted murderers from Senate Bill 1437's reach, it has only to amend the law.

c. *Equal protection*

Munoz next argues that construing Senate Bill 1437 to apply to murder, but not attempted murder, would likely violate the equal protection guarantees contained in the federal and California Constitutions.  (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a).)  Because courts should endeavor to construe statutes so as to avoid constitutional issues, he argues, Senate Bill 1437 should be interpreted to encompass attempted murder.  (See *People v. Miracle* (2018) 6 Cal.5th 318, 339 [a statute " 'must be construed, if reasonably possible, in a manner that avoids a serious constitutional question' "].)  We detect no constitutional infirmity.

(i)  *Munoz is not similarly situated to persons convicted of murder*

Munoz fails to establish the first requirement for an equal protection claim, i.e., that he is similarly situated to persons convicted of murder.  " 'The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally.  [Citation.] Accordingly, " '[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' "  [Citation.]  "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' "  [Citation.]'  [Citation.]"  (*People v. Valencia, supra*, 3 Cal.5th at p. 376; *People v. Wilkinson* (2004) 33

43

Cal.4th 821, 836.)  As relevant here, the equal protection guarantees of the federal and state constitutions are substantially equivalent and are analyzed in the same manner. (*People v. Chatman* (2018) 4 Cal.5th 277, 287; *People v. K.P.* (2018) 30 Cal.App.5th 331, 341; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 686.)

*People v. Lopez* recently concluded that persons convicted of murder are not similarly situated to persons convicted of attempted murder for purposes of Senate Bill 1437, and we agree. (*People v. Lopez, supra*, 2019 Cal.App. Lexis 773 at pp. *34—*36.) Attempted murder and murder are different offenses.  (*Id.* at p. *35; *People v. Marinelli* (2014) 225 Cal.App.4th 1, 5 [an attempt is a separate and distinct offense from the completed crime].)   Significantly, attempted murder is punished less harshly than murder.  "These different penal consequences necessarily mean, for purposes of sentencing reform, an individual charged with, or convicted of, murder under the natural and probable consequences doctrine is not similarly situated to an individual confronting a charge of attempted murder . . . under the doctrine." (*People v. Lopez*, at pp. *35—*36.)

(ii)  *A rational basis exists for limiting Senate Bill 1437 to persons convicted of murder*

Munoz's equal protection claim also fails because he has not shown the absence of a rational basis for the Legislature's decision to exclude from Senate Bill 1437's reach persons convicted of attempted murder.

The constitutional guarantee of equal protection does not prohibit the state from drawing distinctions between different groups of individuals, but it requires that, at a minimum, such classifications bear a rational relationship to a legitimate public

44

purpose.  (*In re J.M.* (2019) 35 Cal.App.5th 999, 1010.)  When the law involves a suspect classification, such as race or national origin, or affects a substantial right, it is subject to strict scrutiny; the state must show it has a compelling interest justifying the law and the distinctions drawn by the law are necessary to effectuate its purpose. (*People v. Chatman*, *supra*, 4 Cal.5th at p. 288; *People v. Wilkinson*, *supra*, 33 Cal.4th at p. 836; *In re J.M.*, at p. 1010.)

But "[w]here . . . a disputed statutory disparity implicates no suspect class or fundamental right, 'equal protection of the law is denied only where there is no "*rational relationship* between the disparity of treatment and some legitimate governmental purpose." ' [Citation.]" (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*), italics added; *People v. Wolfe*, *supra*, 20 Cal.App.5th at p. 689; *People v. Bloomfield* (2017) 13 Cal.App.5th 647, 658; *People v. Mora* (2013) 214 Cal.App.4th 1477, 1483 [where rational basis review applies, the statutory classification withstands an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification].)  Rational basis review "sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny. Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair." (*People v. Chatman*, *supra*, 4 Cal.5th at p. 289.)

Rational basis review applies here.  A criminal defendant does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives. (*People v. Wilkinson, supra*, 33 Cal.4th at p. 838; *People v. Wolfe*, *supra*, 20 Cal.App.5th at p. 689; *People v. Bloomfield*, *supra*, 13

Cal.App.5th at p. 657; *People v. Acosta* (2015) 242 Cal.App.4th 521, 527.) For that reason, courts have repeatedly held that the rational basis test applies to equal protection claims based on sentencing disparities. (*Wilkinson*, at p. 838; *Bloomfield*, at pp. 657–658; *People v. Ward* (2008) 167 Cal.App.4th 252, 258; *People v. Flores* (1986) 178 Cal.App.3d 74, 88.) "[W]here the issue is not whether a deprivation of an individual's liberty will occur, but rather the duration of that deprivation, rational basis review is appropriate" because the power to define crimes and fix penalties is vested exclusively in the legislative branch. (*People v. K.P.*, *supra*, 30 Cal.App.5th at p. 343.) Thus, rational basis review applies to Munoz's equal protection claim.[21]

---

[21] *People v. Olivas* (1976) 17 Cal.3d 236, on which Munoz relies, does not compel a different result. *Olivas* considered an equal protection claim involving a statute that allowed juvenile defendants, convicted in adult criminal proceedings, to be committed to the CYA for terms longer than the jail terms they would have received had they been sentenced as adults. (*Id.* at pp. 239–242; *People v. Wilkinson*, *supra*, 33 Cal.4th at p. 837.) *Olivas* concluded this disparity implicated a fundamental right— personal liberty—triggering application of the strict scrutiny standard. (*Olivas*, at pp. 250–251; *Wilkinson*, at p. 837.) However, in *Wilkinson*, our Supreme Court "subsequently rejected the argument that the *Olivas* decision means that strict scrutiny is applied 'whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to "personal liberty" of the affected individuals.' [Citation.] Instead, the Supreme Court has said that the rational basis test applies to equal protection challenges based on sentencing disparities." (*People v. Ward*, *supra*, 167 Cal.App.4th at p. 258; *Wilkinson*, at pp. 837–838; see *People v. Lopez*, *supra*, 2019 Cal.App. Lexis 773 at pp. *36–*37; *In re J.M.*,

The mere fact that different punishments may result from application of section 1170.95 to murderers, but not attempted murderers, is not dispositive.  In applying the rational basis test, "neither the existence of two identical criminal statutes prescribing different levels of punishments, nor the exercise of a prosecutor's discretion in charging under one such statute and not the other, violates equal protection principles." (*People v. Wilkinson, supra*, 33 Cal.4th at pp. 838—841 [statutory scheme allowing battery on a custodial officer without injury to be punished more severely than battery on a custodial officer with injury did not violate equal protection principles]; *People v. Romo* (1975) 14 Cal.3d 189, 196—197 [rejecting equal protection challenge where assault could be punished more severely than the greater offense of assault with the intent to commit murder]; *People v. Morales, supra*, 33 Cal.App.5th at p. 808 [imposing harsher punishment for unlawfully driving a vehicle than for theft of the same vehicle does not violate equal protection]; *People v. Acosta, supra*, 242 Cal.App.4th at pp. 527—528 [no equal protection violation where Proposition 47 allowed theft of a vehicle valued under $950, but not attempted burglary of a vehicle of the same value, to be reduced to a misdemeanor]; *People v. Flores, supra*, 178 Cal.App.3d at pp. 85—88 [no equal protection violation where legislature did not divide crime of attempted murder into degrees, allowing for the same punishment to be imposed for attempted first degree murder and attempted second degree murder].)  The Legislature has

_____

*supra*, 35 Cal.App.5th at pp. 1010—1011; *People v. K.P., supra*, 30 Cal.App.5th at pp. 342—343.)

47

considerable latitude in defining and setting the consequences of criminal offenses.  (*Johnson*, *supra*, 60 Cal.4th at p. 887.)

Senate Bill 1437's legislative history demonstrates that the Legislature had a rational basis for excluding attempted murder from section 1170.95.  The statute's uncodified declaration of findings and intent reveals that in enacting Senate Bill 1437, the Legislature was primarily concerned with making punishment commensurate with a defendant's individual culpability.  The Legislature stated, "There is a need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides," and "[i]t is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability."  (Stats. 2018, ch. 1015, § 1, subds. (b), (d).)  "Reform is needed in California to limit convictions and subsequent sentencing so that the law of California fairly addresses the culpability of the individual and assists in the reduction of prison overcrowding, which partially results from lengthy sentences that are not commensurate with the culpability of the individual." (*Id.*, at subd. (e).)  Thus, the Legislature's dual intents—making conviction and punishment commensurate with liability, and reducing prison overcrowding by eliminating lengthy sentences where unwarranted—dovetailed.

When considering Senate Bill 1437, the Senate and Assembly Appropriations Committees examined the potential fiscal impact of the proposed law.  They recognized that Senate Bill 1437 would entail "potentially . . . major costs in the millions of dollars" to allow courts to process and adjudicate resentencing petitions, and potentially "major costs in the hundreds of thousands of dollars to the millions of dollars" to allow the

48

Department of Corrections and Rehabilitation to supervise and transport inmates to resentencing hearings.  (Sen. Com. on Appropriations, Analysis of Sen. Bill 1437 (2017—2018 Reg. Sess.) May 14, 2018, p. 1; Assem. Com. on Appropriations, Analysis of Sen. Bill 1437 (2017—2018 Reg. Sess.) Aug. 8, 2018, p. 1; see also Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 1437 (2017—2018 Reg. Sess.) May 29, 2018, p. 6.)  These costs, the Senate Committee recognized, would be "dependent on the number of individuals who would file a petition for resentencing pursuant to this bill."  (Sen. Com. on Appropriations, May 14, 2018, *supra*, p. 1.)  The Senate Committee observed that, as of December 31, 2017, there were 14,473 inmates serving a term for a principal offense of first degree murder, and 7,299 for second degree murder; it did not include in its calculations the number of inmates serving terms for attempted murder.  (Sen. Com. on Appropriations, May 14, 2018, *supra*, p. 3.)  The committee estimated that if only 10 percent of this population petitioned, additional costs to the state would approximate $7.6 million in court costs, potentially resulting in delayed court services and putting pressure on the state's General Fund.  (*Ibid.*)

Juxtaposed against this background, the Legislature could take into account the fact that the punishment for attempted murder is generally far less than the punishment imposed for murder.  First degree murder is punishable by death, life in prison without the possibility of parole (LWOP), or 25 years to life in prison.  Where the sentence is 25 years to life, the defendant is not eligible for parole until he or she has served 25 years. (*People v. Chiu, supra*, 59 Cal.4th at p. 163; § 190, subds. (a), (e).)  A defendant convicted of second degree murder

must serve a sentence of 15 years to life, with parole eligibility after 15 years.  (*Chiu*, at p. 163; § 190, subds. (a), (e).)  If the second degree murder was accomplished by intentionally shooting a firearm from a motor vehicle at a person outside the vehicle with the intent to inflict great bodily injury, the term is 20 years to life.  (§ 190, subd. (d).)

In contrast, attempted murder is punishable by a determinate term of five, seven, or nine years.  (*People v. Chiu*, *supra*, 59 Cal.4th at p. 163; § 664, subd. (a).)  If the jury finds an attempted murder was premeditated and deliberate, the defendant is subject to a sentence of life with the possibility of parole, but is eligible for parole after serving a term of seven years.[22]  (*Chiu*, at p. 163; §§ 664, subd. (a), 3046, subd. (a)(1).)  Thus, contrary to Munoz's argument, the base sentences imposed upon persons convicted of murder and attempted murder are not "absurdly disparate."

A successful Senate Bill 1437 petitioner's criminal culpability does not simply evaporate; a meritorious section 1170.95 petition is not a get-out-of-jail free card.  Instead, the petitioner is resentenced on the remaining convictions.  If the murder was charged "generically" and the target offense was not charged, the murder conviction must be redesignated as the target offense or underlying felony for resentencing purposes.  (§ 1170.95, subds. (d)(3), (e).)  Accordingly, the Legislature could

---

[22]    The term for attempted murder is also increased to life with the possibility of parole if the victim was a peace officer, firefighter, or certain other custodial personnel, under specified conditions.  (§ 664, subd. (e).)  The term for second degree murder is likewise increased when the victim was a peace officer, under certain conditions.  (§ 190, subd. (c).)

have taken into account that punishment for many of the target crimes that tend to underlie natural and probable consequences killings are comparable, or at least not extremely disparate, to the base term for attempted murder.  For example, carjacking carries a sentence of three, five, or nine years.  (§ 215, subd. (b).)  First degree robbery is punishable by a term of three, four, or six years; that term increases to three, six, or nine years if the defendant acts in concert with others and commits the robbery in an inhabited dwelling.  (§ 213, subd. (a)(1).)  Assault with a semiautomatic firearm carries a penalty of three, six, or nine years.  (§ 245, subd. (b).)  Assault with a deadly weapon other than a firearm may be punished by two, three, or four years.  (§ 245, subd. (a)(1).)  The sentence for first degree burglary is two, four, or six years.  (§ 461, subd. (a).)  And, for shooting at an inhabited dwelling or at an occupied vehicle, or shooting from a motor vehicle, a defendant can be punished with a prison term of three, five, or seven years.  (§§ 246, 26100, subd. (c).)

Consider the following hypothetical defendants.  Defendant X participates in a carjacking in which a victim is killed.  Defendant X is not the actual killer and does not act with implied malice or the intent to kill.  He is convicted of first degree murder on a natural and probable consequences theory, and qualifies for section 1170.95 resentencing.  He would then be sentenced on the underlying felony, carjacking, with a potential high term of nine years.  Defendant Y, let us assume, participated in a comparable carjacking.  Like Defendant X, he is not the actual killer, and does not act with implied malice or the intent to kill.  The victim in Defendant Y's carjacking, however, survives.  Defendant Y is convicted of attempted murder on a natural and probable consequences theory, and he is not eligible for section 1170.95

51

resentencing. However, his sentence for the attempted murder would be either five, seven, or nine years—comparable to Defendant X's nine-year term.

Thus, balancing the costs involved, the fact the penalties for attempted murder are less severe than for murder, and the length of prison terms mandated for many potentially relevant felonies, the Legislature could rationally have determined that extending Senate Bill 1437 relief to attempted murderers would put too great a strain on state resources, while resulting—in most cases—in insignificant decreases in the sentences served for attempted murder convictions. The Legislature could reasonably conclude its aims could be achieved by limiting relief to persons convicted of murder, but not attempted murder. "Preserving the government's financial integrity and resources is a legitimate state interest." (*People v. Chatman*, *supra*, 4 Cal.5th at p. 290; *In re C.B.*, *supra*, 6 Cal.5th at pp. 133—134; *People v. Lopez*, *supra*, 2019 Cal.App. Lexis 773 at pp. *39—*41; *People v. Cruz* (2012) 207 Cal.App.4th 664, 679.)

Munoz contends that any additional costs to extend Senate Bill 1437 to attempted murderers would have been offset by savings recognized in reduced incarceration expenses. This circumstance does not compel a finding of irrationality. Such cost savings would only accrue if the petitions were successful; they would also depend upon other variables, such as the term ultimately imposed at resentencing and the time the inmate had already served, both unknown quantities that the Legislature was not required to spotlight in its analysis. In any event, when applying the rational basis standard, "we cannot cast aside the deferential nature of our inquiry." (*People v. Chatman*, *supra*, 4 Cal.5th at p. 294.) We " 'accept any gross generalizations and

52

rough accommodations that the Legislature seems to have made.' " (*Johnson, supra*, 60 Cal.4th at p. 887.)  The rational basis standard " 'does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated. [Citation.]  While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation].  It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.]" (*Id.* at p. 881; *Chatman*, at p. 289.)

　　*People v. Chatman* is instructive.  There, the court considered an equal protection challenge to a statutory scheme in which not all felons were eligible to receive certificates of rehabilitation on an equal basis.  (*People v. Chatman, supra*, 4 Cal.5th at p. 282.)  A former probationer who succeeded in having his or her conviction dismissed under section 1203.4 was statutorily ineligible for such a certificate if he or she was subsequently incarcerated.  (*Chatman*, at p. 282.)  "In contrast, former prisoners—whether subsequently incarcerated or not— face[d] no such restriction." (*Ibid.*)  Applying rational basis review, *Chatman* found no equal protection violation.  The court explained:  "while certificates provide substantial benefits to rehabilitated felons, adjudicating eligibility for them depends on the state's expenditure of significant judicial and executive branch resources.  In providing this costly benefit only to former prisoners and former probationers who have not been subsequently incarcerated, the Legislature engaged in a line-drawing that—while perhaps not emblematic of the ideal rehabilitative system—embodies a sufficiently rational

53

determination regarding distribution of resources." (*Id.* at p. 283.)  Moreover, former prisoners, as opposed to former probationers, had a higher relative need for such certificates, in that they were ineligible to have their convictions dismissed under section 1203.4, and obtaining a certificate was their primary avenue for relief.  (*Chatman*, at pp. 283, 291.)  "The Legislature rationally could have taken into account former probationers' lower relative need for certificate of rehabilitation relief when determining which group of petitioners to disqualify from such relief for the sake of preserving government resources." (*Id.* at p. 291.)

Here, the Legislature could have made a similarly rational calculus.  Like the certificate of rehabilitation process described in *Chatman*, significant resources are necessary to effectuate the Senate Bill 1437 resentencing process.  Trial courts must consider petitions; defendants are entitled to counsel; and prosecutors must prepare and file responses.  Section 1170.95 further contemplates, at least in some cases, a hearing at which new evidence can be elicited.[23]  In short, Senate Bill 1437 requires a potentially significant expenditure of judicial, prosecutorial, and defense resources, not to mention the possible burden on witnesses who may have to testify in matters they believed to be long since concluded.  The Legislature could also have found that, in general, persons convicted of murder have a greater relative need for relief due to the harsher punishments

---

[23]    We express no opinion on the specific workings of the section 1170.95 resentencing procedure, such as when in the process counsel must be appointed or the particular procedures required at the evidentiary hearing.

54

mandated for murder, as opposed to attempted murder. Thus, the legislative decision to extend Senate Bill 1437 relief to only a subset of persons convicted under the natural and probable consequences theory was not irrational. (See *People v. Chatman*, *supra*, 4 Cal.5th at p. 292 ["This limited extension accomplished the goal of increasing the number of people who can receive relief from the effects of their convictions, while avoiding, in a manner not inconsistent with rationality, high costs by not extending that relief to all former probationers"].)

We acknowledge that it is possible an attempted murderer, who did not act with malice, could hypothetically receive a longer sentence than if murder had resulted from commission of the target crime.[24] But California's sentencing scheme is complex; any given sentence depends on a myriad of variables including applicable enhancements, the number of victims, application of section 654, exercise of the trial court's discretion, and so on. We do not believe that, to survive rational basis scrutiny, the Legislature was required to finely calibrate Senate Bill 1437 to take into account all possible sentencing permutations for all

---

[24] Munoz avers that, had he been sentenced on only a single conviction of shooting at an occupied motor vehicle in violation of section 246, as he expects he would be if he qualified for relief and was resentenced under section 1170.95, his sentence would be no more than seven years for violation of section 246, plus a 10-year gang enhancement. Munoz's calculations are incorrect. At the very least, for the section 246 offense, the penalty is life imprisonment, with a minimum term of no less than 15 years. (§ 186.22, subd. (b)(4)(B); *People v. Jones* (2009) 47 Cal.4th 566, 572; *People v. Brookfield* (2009) 47 Cal.4th 583, 591.) However, he appears to be correct that his current sentence exceeds that which might be imposed if he were eligible for section 1170.95 relief.

possible defendants. " 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citations], or 'because it may be "to some extent both underinclusive and overinclusive" ' [citation]." (*Johnson, supra*, 60 Cal.4th at p. 887; *People v. Chatman, supra*, 4 Cal.5th at pp. 290—291.) And, " '[n]othing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all." [Citation.] Far from having to "solve all related ills at once" [citation], the Legislature has "broad discretion" to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination. [Citations.]' " (*People v. Acosta, supra*, 242 Cal.App.4th at pp. 527—528 [court had "no difficulty concluding that the electorate could rationally extend misdemeanor punishment to some nonviolent offenses but not to others, as a means of testing whether Proposition 47 has a positive or negative impact on the criminal justice system"].) "If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' [Citations.]" (*Johnson*, at p. 881; see *People v. Chatman, supra*, 4 Cal.5th at p. 289.) Senate Bill 1437's resentencing procedure is rationally related to the Legislature's stated purposes, and that is enough to survive rational basis review.

Munoz's citations to *Newland v. Board of Governors* (1977) 19 Cal.3d 705, and *People v. Schoop, supra*, 212 Cal.App.4th 457, do not assist him. *Newland* found an equal protection violation where the law allowed an individual convicted of a felony sex crime to obtain a certificate of rehabilitation, but a person who was convicted of a misdemeanor sex crime could not. (*Newland*, at pp. 707—708, 712—713.) *Schoop* found an equal protection

56

violation where persons convicted of one statute were subject to a 10-year waiting period before applying for a certificate of rehabilitation, whereas persons convicted of similar offenses had to wait only seven years. (*Schoop*, at pp. 470—474.) In neither case was a rational basis shown for the statutory distinctions. Indeed, in *Newland*, the Attorney General did not even attempt to offer a justification. (*Newland*, at p. 713.) Here, in contrast, a rational basis exists.

To the extent Munoz intends to claim that excluding attempted murderers from section 1170.95's petitioning procedure violates equal protection principles as applied to him, this contention necessarily fails. Munoz cannot show he would be entitled to relief even if section 1170.95 applied to his offense of attempted murder. A trial court considering a section 1170.95 petition must determine whether the petitioner "could not be convicted of first or second degree murder because of changes to" sections 188 and 189 made by Senate Bill 1437. (§ 1170.95, subds. (a)(3), (d)(3).) As relevant here, Senate Bill 1437 amended the law to provide that malice could not be imputed based solely on a defendant's participation in a crime. (§ 188, subd. (a)(3).)

There is no possibility that the jury in this case convicted Munoz based on a finding of imputed, as opposed to actual, malice. Express malice exists when a defendant intends to kill. (§ 188, subd. (a)(1); *People v. Beltran* (2013) 56 Cal.4th 935, 941.) Munoz and decedent Loaiza were both passengers in Rojas's car when they committed the shooting. The jury found, and the evidence showed, that Munoz personally and intentionally fired at the Yukon. It also found that the attempted murders were willful, premeditated and deliberate. The jury was instructed that it could find premeditation and deliberation if either Munoz

57

or Loaiza premeditated and deliberated. The instruction advised that Munoz or Loaiza acted willfully "if he intended to kill when he acted." Thus, the jury had to find that either Munoz, Loaiza, or both of them, premeditated and deliberated the shooting, and intended to kill.[25] Loaiza and Munoz engaged in nearly identical conduct, simultaneously firing at the same vehicle, from the same vantage point. Munoz was armed with a semiautomatic firearm which contained a bullet in the chamber and a magazine containing five live cartridges. However, the evidence showed the gun jammed, precluding Munoz from firing more than one shot. On these facts, there is no basis whatsoever upon which a rational trier of fact could find Loaiza premeditated and intended to kill, but Munoz did not. Their conduct was the same, and there was no evidence suggesting Munoz might have had any less culpable mental state. Accordingly, there is no possibility Munoz could show he would be entitled to relief under section 1170.95, even if it covered attempted murder. Any as-applied challenge to Senate Bill 1437 therefore fails.[26]

---

[25] To the extent the instructions allowed the jury to consider Rojas's mental state, this circumstance is irrelevant at this juncture. The jury deadlocked on the attempted murder charges as to Rojas, demonstrating it could not have found Munoz premeditated based on Rojas's mental state.

[26] We express no opinion on whether an as-applied equal protection challenge to Senate Bill 1437's exclusion of attempted murder could ever succeed—we hold only that it does not prevail here.

[[d. *California Constitution's prohibition against unusual punishment*

Munoz next argues that "denying the benefits" of Senate Bill 1437 to persons convicted of attempted murder on a natural and probable consequences theory "may engender 'unusual punishment' considerations." In support, he cites *People v. Schueren* (1973) 10 Cal.3d 553 and *People v. Wingo* (1975) 14 Cal.3d 169, for the proposition that punishing a lesser included offense more severely than a greater offense is unusual punishment under the California Constitution. (See *People v. Smith* (2015) 234 Cal.App.4th 1460, 1468—1469; *People v. Doyle* (2013) 220 Cal.App.4th 1251, 1268.) This contention need not detain us long. As we have explained, Senate Bill 1437 does not require a greater punishment for attempted murder than for murder. Thus, it is not facially unconstitutional.

As to the contention that Munoz's specific sentence is unconstitutionally unusual, this claim is not yet ripe for review. As explained in the next section, we are vacating Munoz's sentence and remanding the matter for resentencing, to allow the trial court to exercise its discretion to determine whether to strike or dismiss the section 12022.53 firearm enhancements. No final sentence is yet in place. (See *People v. Garcia* (2018) 30 Cal.App.5th 316, 329 ["Until a new sentence is imposed, it is uncertain whether the same constitutional concerns will arise"].)

4. *The matter must be remanded for resentencing*

When the trial court sentenced Munoz in July of 2017, imposition of a section 12022.53 firearm enhancement was mandatory and the trial court lacked discretion to strike it. (See *People v. Franklin* (2016) 63 Cal.4th 261, 273.) Accordingly, the

59

court imposed consecutive terms of 25 years to life on counts 1 and 2 pursuant to section 12022.53, subdivisions (d) and (e)(1).[27]

Effective January 1, 2018, the Legislature amended section 12022.53, subdivision (h) to give trial courts authority to strike section 12022.53 firearm enhancements in the interest of justice. (Sen. Bill No. 620 (2017–2018 Reg. Sess.), Stats. 2017, ch. 682, § 2.)  Munoz contends his case must be remanded to allow the trial court to exercise its discretion to strike the firearm enhancements, and the People agree.  The parties are correct. The amendment to section 12022.53 applies to cases, such as appellant's, that were not final when the amendment became operative.  (*People v. Watts* (2018) 22 Cal.App.5th 102, 119; *People v. Arredondo* (2018) 21 Cal.App.5th 493, 507; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090–1091; *People v. Brown, supra*, 54 Cal.4th at p. 323; *People v. Vieira* (2005) 35 Cal.4th 264, 305–306; *People v. Nasalga* (1996) 12 Cal.4th 784, 792; *Estrada, supra*, 63 Cal.2d at p. 745.)  Remand is necessary to allow the trial court an opportunity to exercise its sentencing discretion under the amended statute.  (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)  We express no opinion about how the court's discretion should be exercised.**]]**

---

[27]     The court also imposed a 25-years-to-life term for the firearm enhancement on count 3, but stayed it pursuant to section 654.

## DISPOSITION

Munoz's sentence is vacated and the matter is remanded to allow the trial court to exercise its discretion and determine whether to strike or dismiss the section 12022.53 firearm enhancements pursuant to section 12022.53, subdivision (h). The judgment of conviction is otherwise affirmed.

## CERTIFIED FOR PARTIAL PUBLICATION

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

61